May Term,
1859.

JOHNSON
v.
CHAMBERS.

---

## JOHNSON and Another *v.* CHAMBERS and Another.

Where goods were ordered to be forwarded by the first boat leaving *P.* for the *Wabash*, it was *held*, that the direction meant no more than that they should be forwarded at the earliest opportunity.

A document of another state not admissible in evidence by the common law, will be rejected where the statute of the foreign state is not produced, though such a document of this state is admissible by our statute.

The Courts cannot take notice of the statutes of a foreign state changing the common law.

*Wednesday,
May 25.*

APPEAL from the *Tippecanoe* Court of Common Pleas.

PERKINS, J.—The appellees brought an action for goods sold and delivered, against the appellants.   The complaint contained only a single paragraph, in the form of the common count, accompanied by a bill of particulars.   The defense was a denial of all the allegations in the complaint. On this issue there was a trial by a jury, verdict for plain-

tiffs, and judgment on the verdict, over a motion for a new trial, which was overruled by the Court, and to which the proper exception was taken by the appellants.

The evidence and instructions all appear in the record by bills of exceptions. The facts are these: "The appellees, in the spring of 1856, were wholesale dealers in glass, residing at *Pittsburgh*, in the state of *Pennsylvania*. The appellants were hardware merchants, residing and doing business at *Lafayette*, in the state of *Indiana*. About the 12th day of *March*, 1856, *Johnson*, one of the firm of *Johnson* and *Patton*, called on the appellees, at their place of business in *Pittsburgh*, and verbally ordered fifteen half-boxes of glass, to be shipped to the appellees at *Lafayette*, by the first steamer that should leave *Pittsburgh* for the *Wabash* river. At the time this order was made, the *Ohio* river, at *Pittsburgh*, was closed with ice. On the 25th of *March*, 1856, the river was open for navigation; and on the 27th, the steamboat *Latrobe*, freighted at *Pittsburgh*, left that port for the *Wabash* river, but the glass which had been ordered by the appellees, was not shipped on the *Latrobe*, which was the first boat. The appellants knew of the arrival of the *Latrobe*. On the 2d of *April*, 1856, the glass was put on board the *Gov. Powell*, the second steamboat that left *Pittsburgh* for the *Wabash* river. The *Powell* left *Pittsburgh* on the 2d of *April*, and owing to the difficulties of the navigation in the *Wabash* river, got no farther than *Terre Haute*, where she discharged her cargo, including the glass consigned to the appellants, leaving it in the hands of a warehouseman, and returned to the *Ohio* river. At the time the glass was put on board the *Powell*, the appellees took from her commander a bill of lading, which, with the bill of goods made out by the clerk in the house of the appellees, they forwarded by mail, to the appellants. In *May* or *June*, following, the appellees received a letter from the warehouseman at *Terre Haute*, informing them that the glass had been stored with him. In *August*, following, the appellees drew a draft on the appellants, for the amount of their bill, payable in *September*, six months from the time the glass was ordered. This draft was pre-

sented to the appellants on the 16th of *September*, 1856, and they declined accepting it, at the same time writing to the appellees as follows: " Your draft on us was to-day presented for our acceptance, and, as we have not yet received the glass shipped us on the *Gov. Powell*, we declined accepting it. The *Gov. Powell* has never been at our wharf, although we did hear that she was in the *Wabash*. If you can ascertain the disposition the boat has made of her cargo, we shall be pleased to hear from you." This letter was received by the appellees, at *Pittsburgh*, about the 20th of *September*, 1856. It was in proof that the appellees used exertions to ship the glass on the *Latrobe*, and that her agent refused to receive the freight, because her full freight had already been engaged before the appellees applied. *Ward*, a witness for the appellants, testified that he accompanied *Johnson* to the house of the appellees, and introduced him to them, and was present when he gave the order for the glass; and that *Johnson* was particular to direct them to send it by the first steamer.

The appellees used due diligence to ship by the *Latrobe*. It did not receive general freight. The *Powell* was the first boat that did.

We think it plain that it was not a condition of the contract of purchase of the goods in question, that they should be sent by the first boat leaving *Pittsburgh* for the *Wabash*. It was not then known to either party which boat, of all those on the waters, would leave first. It might happen to be a worthless and entirely unsafe one. The direction meant no more than that the goods should be forwarded at the earliest suitable opportunity. But, in fact, the goods were sent by the first boat, within the direction. The *Latrobe* had been previously chartered by a few shippers, for whom, alone, she did business, and was not open to general freight. The *Powell* was the first boat, thus open, that left *Pittsburgh* the spring of the purchase of the goods, the price of which is sued for.

But it is contended that the contract of sale is void by the statute of frauds, and hence, that a suit cannot be maintained upon it.

It is admitted by the counsel for the appellees, that the delivery of the goods to the carriers was not a delivery to the purchaser, whereby the case would be taken out of the statute. See 2 Pars. on Cont. 327 to 330; Brown on the Statute of Frauds, §§ 328, 329, 330. But it appears that the contract was made in *Pennsylvania*, while no law of that state is pleaded and proved in the case.

And the question is, shall the common law, or the statute of this state, be applied in determining the case?

When the question has arisen, in this state, upon the admission of a document from another state, as evidence, which, by the common law, would not be admissible, while, by our statute, such a document of this state, would be admissible, the Court has applied the common law, and rejected the evidence, where the statute of the other state has not been produced. *Wright* v. *Bundy*, 11 Ind. R. 398, and cases cited.—Ind. Dig. p. 424, § 26.

The same rule has been adopted in cases involving the validity of contracts. See *Titus* v. *Scantling*, 4 Blackf. 89; *Blystone* v. *Burgett*, 10 Ind. R. 28; and, still more in point, *Trimble* v. *Trimble*, 2 Ind. R. 76. See, also, *Doe* v. *Collins*, 1 Ind. R. 24.

There is some reason for the rule of presumption as to the common law. The Courts will take notice of the facts that our ancestors came to this country from *Great Britain*, bringing that law with them; that that law, so far as applicable in this country, was in force in the thirteen original states, except as modified by the statutes thereof; that it was declared in force in the territories of the northwest by the ordinance of 1787, &c.

The Courts cannot take notice judicially of statutes of the states which may have changed the common law. See *Doe* v. *Collins, supra.*

Nevertheless, the subject is one not clear of difficulty, and doubts have been expressed as to the rule that should govern.

We have not now time to examine the subject at large, nor do we mean to lay down a universal rule. The case at bar falls within those last cited above, and will be de-

May Term,
1859.

JOHNSON
v.
CHAMBERS.

cided upon them, We place it upon the common law. By that law, a parol contract for the sale of goods, to any amount, was valid. *Sutton* v. *Sears*, 10 Ind. R. 223.

*Per Curiam.*—The judgment is affirmed, with 1 per cent. damages and costs.

*S. A. Huff, Z. Baird,* and *J. M. La Rue,* for the appellants (1).

*R. C. Gregory, H. W. Chase,* and *J. A. Wilstach,* for the appellees (2).

(1) Counsel for the appellants made the following argument:

Upon the facts [as stated *supra*], the Court instructed the jury, at the request of the appellees:

1. That a delivery to a common carrier is a sufficient delivery to the vendees.

2. That steamboats employed in carrying goods from one place to another, are common carriers.

3. That if the appellants were notified of the shipment of the glass by the *Gov. Powell,* and made no objection, and gave no notice of their dissent until *September* 16, 1856, knowing that the *Latrobe* was the first steamer leaving *Pittsburgh,* and that she was at *Lafayette* in *April,* then they waived their right of having their goods shipped on the first boat.

4. The jury may presume from the letter of *September,* 16, 1856, that the defendant waived all objections as to the goods not being shipped on the first boat, if written with a knowledge that the *Gov. Powell* was not the first boat leaving *Pittsburgh* for *Lafayette.*

The appellants requested the Court to give the following instructions:

1. That if the defendants ordered the goods shipped on the first boat, which was not done, and the goods have never been received by the defendants, the jury should find for the defendants.

2. Ordering goods to be shipped by the first boat, gave the plaintiffs no right to ship by any other boat; and, if the plaintiffs shipped contrary to the directions of the defendants, they cannot recover, unless they prove a delivery of the goods by them.

The first of the instructions requested by the appellants, the Court refused to give as requested, but modified it by adding the words, "unless the defendants waived a compliance with their order, or ratified the acts of the plaintiffs in shipping by another boat." The appellants excepted to the refusal of the Court to give the first instruction as requested, and also to the modification made to it.

The second instruction requested by the appellants was refused, and the refusal excepted to.

To the several instructions given by the Court, at the instance of the appellees, exceptions were taken in due form.

We insist that this judgment should be reversed. The verdict is wholly unsupported by evidence—is contrary to the law applicable to the facts proven—

and is the result of the misdirection of the Court below in the instructions given to the jury, at the instance of the appellees.

All that is proven of the sale and delivery of property, by the appellees to the appellants is, that *Johnson*, one of the firm of *Johnson* and *Patton*, called at the store of the appellees at *Pittsburgh*, and verbally ordered fifteen half-boxes of glass to be shipped to the appellants, at *Lafayette*, by the first boat leaving *Pittsburgh* for the *Wabash* river. Not one single other act or circumstance is shown relating either to a sale or delivery of the glass. When the order was made, no act was done to identify the particular boxes of glass to be shipped, no separating the articles from the other articles of merchandise in the establishment of the appellees, nothing that would have enabled *Johnson* and *Patton* to reach the articles ordered, by process of law, to obtain possession of them, nor anything that would have placed the goods at their risk, in the possession of the vendors. It was not a sale of goods such as would have been binding at the common law; and the defense against the action, to be successful, needs not the interposition of any statute of frauds. The complaint is for property sold and delivered; and is not to be sustained by evidence which neither shows a sale or delivery. "At common law," says *Parsons*, "if the seller makes a proposition, and the buyer accepts, and the goods are in the immediate control of the seller, and nothing remains to be done to identify them, or in any way to prepare them for delivery, the sale is complete." Pars. on Cont. 320. Under this rule there was no contract, binding on the parties, at the common law, made at *Pittsburgh* when *Johnson* was there; for the goods were not identified, nor prepared for delivery until after he had left *Pittsburgh*. The date of the invoice forwarded to the appellants was *April* 2, 1856. *Johnson*, who it is shown, gave the verbal order, was in *Pittsburgh* on the 12th of *March*, 1856, and only remained there one day. This makes it evident that, when *Johnson* left *Pittsburgh*, the goods ordered remained to be identified and prepared for delivery. They were thus identified and prepared on the 2d of *April*, 1856, for this is the date at which the appellees fix the sale. We do not pretend that the date of this invoice is material for any other purpose than to show that the sale was not complete, within the terms of the common law, when *Johnson* ordered the goods and left *Pittsburgh*.

The goods were ordered to be shipped by the first boat, and the seller had no authority to ship by any other. *Ward's* testimony shows that *Johnson* was explicit in his direction that the glass should be shipped by the first boat leaving *Pittsburgh* for the *Wabash*. The appellees admit that they did not, and could not, comply with this direction, and here, we insist that whatever contract there was in this verbal order given by *Johnson*, was at an end; for the appellees had no authority to ship by any other boat. Importance seems, from the evidence, to have been attached to his requirement that the glass should be shipped by the first boat, and the sequel proves that it was a condition quite essential to the purchase, so far as the appellants were concerned; for, according to the evidence, the first boat that left *Pittsburgh* that spring, seems to have been the only one that ever arrived at *Lafayette*. When the appellees ascertained that they could not ship the glass to the appellants by the first boat, as directed, the parties stood, in relation to each other, as though no order had ever been made by *Johnson* and *Patton* for the shipment of goods to them by the appellees. Even had the order been in writing, in the most certain and solemn terms, filling every requirement of our statute of frauds, still, had it

required the goods to be shipped by the first boat, it could not become binding upon the appellants, unless the goods had been thus shipped. From the time, then, that the *Latrobe* left the wharf at *Pittsburgh*, on her voyage, the appellants were entirely absolved from the order made the 12th of *March*, 1856. This is so plain a proposition that it is unnecessary to appeal to authority to demonstrate its correctness.

What act of *Johnson* and *Patton*, subsequent to the verbal order given by *Johnson*, at *Pittsburgh*, does the evidence in the case disclose, upon which they ever became chargeable for goods sold and delivered to them by the appellees? On the 2d of *April*, 1856, without request or authority from *Johnson* and *Patton*, the appellees shipped, on board the *Gov. Powell*, fifteen half-boxes of glass, and took a bill of lading, by which it was shown that the glass was consigned to *Johnson* and *Patton*, *Lafayette*, *Indiana*. A duplicate of this bill of lading, with an invoice of the goods, from the house of the appellees, was enclosed and sent by mail to the consignees. Now these acts, on the part of the appellees, were voluntary, and not in pursuance of any contract or request of the appellants. The goods thus shipped, never came to the hands of *Johnson* and *Patton;* and when, in *September*, nearly six months after they were shipped, the appellees presented a draft for the value of the goods, as invoiced, *Johnson* and *Patton*, because the goods had never been received, declined to accept the draft. This refusal to accept the draft, is the act upon which, by the instruction given to the jury, the appellants are to be held as having "waived their right of having the goods shipped by the first boat."

There being no contract arising upon the order of *Johnson*, while at *Pittsburgh*, and the goods having found their way into *Indiana*, by the voluntary shipment of them by the appellees, prior to which time there was no act of the appellants to charge them, if any contract of purchase was made by them at all, it was made in *Indiana* with reference to goods lying in a warehouse at *Terre Haute*. The proof shows that the first knowledge the appellants had, that the goods were at *Terre Haute*, was in *May* or *June*, 1856, two or three months after *Johnson* was at *Pittsburgh*. Up to the time that they were informed that the goods were at *Terre Haute*, *Johnson* and *Patton* had done nothing, according to the evidence, to make them liable for goods not shipped under their order. What act of theirs, after that time, is shown by the evidence, to make the letter refusing to pay for the goods, amount to a waiver of their order, or to an assent to a new contract? In the case of *Bushel* v. *Wheeler*, 15 Q. B. 442, n., cited by the counsel on the other side, the goods had been shipped by the very vessel indicated in the direction of the buyer. They had arrived at their destination, where the buyer was to have received them, and were placed in the warehouse of the owner of the vessel, where the buyer saw them. He told the warehouseman he would not take them, but did not so inform the seller, until after the lapse of five months. The language of COLERIDGE, J., in that case, shows upon what grounds the Court held the contract binding. He says, "I agree that the acceptance must be, in the words of one of the cases, 'strong and unequivocal.' *Maberly* v. *Sheppard*, 10 Bing. 101. But that is quite consistent with its being constructive. Therefore, in almost all cases, it is a question for the jury, whether particular instances of acting or forbearing to act, amount to acceptance, or actual receipt. Here the goods are ordered by the vendee to be sent by a particular carrier, and, in effect, to a particular warehouse, and that is done in a reasonable time. That comes to

the same thing as if they had been ordered to be sent to the vendee's own house, and sent accordingly."

In the case at bar, the goods were ordered to be sent by the first boat, and this was not done. In *Bushel* v. *Wheeler*, the goods were ordered to be sent by a particular carrier, and they were so sent. In the present case, they were ordered to be shipped to the buyers, and sent to them at *Lafayette*. They were shipped, contrary to order, on a boat that never reached *Lafayette*. In *Bushel* v. *Wheeler*, the goods were, in effect, ordered to the house of the buyer, and they were so shipped. The difference between the two cases is obvious. In *Richards* v. *Porter*, 6 Barn. and Cress. 437, the plaintiffs on the 25th of *January*, 1826, had sent to the defendant an invoice of five pockets of hops, and delivered the hops to a carrier to be conveyed to the defendant, and informed him that the hops were so forwarded. The invoice described the plaintiffs as the sellers, and the defendant as the purchaser of the hops. On the 27th of *February*, 1826, the defendant wrote to the plaintiffs as follows: "The hops (five pockets) which I bought of Mr. *Richards* on the 23d of last month, are not yet arrived, nor have I ever heard of them. I received the invoice; the last was much longer than they ought to have been on the road; however, if they *do* not arrive in a few days, I must get some elsewhere, and consequently cannot accept them." The Court, Lord TENTERDEN, C. J., held that there was not an acceptance of the goods. Now, in his letter, *Porter* refers to the invoice, acknowledges its receipt, and speaks of the hops, as the hops he had bought of the plaintiffs.

Here we may notice the question arising upon our statute of frauds, discussed by the counsel for the appellees. As applicable to this question, the authority just cited is referred to. But before citing further authority upon the main question, it is proper to answer, briefly, the argument against the application of the law of *Indiana* to the contract sued on. It is urged, on the other side, that the goods in question were ordered in *Pennsylvania*, and that, in the absence of proof of the statute law of that state to the contrary, it will be presumed that the common law prevails there; and several authorities are cited in support of this proposition, which we admit, in some degree, seem to sustain it. But the recent decisions in *Indiana* and elsewhere overthrow the authorities thus cited. In *Blystone* v. *Burgett*, 10 Ind. R. 28, the Court say, that "the rule presuming the existence of the common law in a sister state, is very much shaken, if not entirely overthrown by the later authorities." In *Shaw* v. *Wood*, 8 Ind. R. 518, it is held that "where no law of a different state is proven, the Court would necessarily act upon the law of our own state." In *Monroe* v. *Douglass*, 1 Seld. 447, it is said to be "a well settled rule, founded on reason and authority, that the *lex fori*, or, in other words, the laws of the country to whose Courts a party appeals for redress, furnish, in all cases, *prima facie*, the rule of decision; and if either party wishes the benefit of a different rule, or law, he must aver and prove it." In *Farina* v. *Home*, 16 Mees. and Wels. 119, where the action was *for goods sent from Cologne* to *London*, on a verbal order of a person trading in *London*, the Court applied the *English* statute of frauds, and it does not seem, from the report of the case, that there was any doubt but that the contract, to be binding, should be so according to the laws of *England*. Upon these authorities, we submit, that if the facts bring the present case within the provisions of § 7 of our statute of frauds, the appellees had no right to recover. Our Courts have

no laws upon which to construe a contract, other than those of this state, unless the law of some other state is a part of the contract, and brought to the notice of the Court upon the trial.

That the case is within the provision of the statute above cited, is manifest, and appears, from the character of the brief of the counsel for the appellees, to be yielded. The only authority to which reference is made in their argument upon this question, is that of *Bushel* v. *Wheeler*, 15 Q. B. 442. This authority we have already adverted to in another part of this brief, and shown, as we conceive, that it bears no resemblance to the present case, in point of fact, and that the decision was based upon circumstances peculiar to that case, and entirely wanting in this. The case of *Richards* v. *Porter*, 6 Barn. and Cress. 437, was a much stronger case, in its facts and circumstances, than the present one, and there the Court held that it was within the statute of frauds. The case of *Farina* v. *Home*, 16 Mees. and Wels. 119, was upon these facts : Goods were shipped by the plaintiff from *Cologne* to *London*, on the verbal order of the defendant ; they were sent to a shipping agent of the plaintiff in *London*, who received them, and warehoused them with a wharfinger, informing the defendant of their arrival. The wharfinger handed to the shipping agent a delivery warrant, whereby the goods were made deliverable to him or his assignees by indorsement, on payment of rent and charges. The agent indorsed and delivered this warrant to the defendant, who kept it for several months ; and, notwithstanding repeated applications, did not pay the price of, or charges on, the goods, nor return the delivery warrant, but said he had sent it to his solicitor. On these facts, the Court held that there was no such delivery to, or acceptance by, the defendant as to satisfy the statute of frauds. How much less do the facts in the present case show a contract of sale such as would satisfy the statute of frauds. By our statute (1 R. S. p. 301, § 7), "No contract for the sale of any goods, for the price of 50 dollars or more, shall be valid, unless the purchaser shall receive a part of such property, or shall give something in earnest to bind the bargain, or in part payment, or unless some note or memorandum in writing of the bargain be made, and signed," &c. It is not pretended that any part of the goods, in this case, has ever been received by the appellants, nor that any earnest has been given to bind the bargain, or in part payment, or that any memorandum in writing has been signed, to charge them, unless the letter written *September* 16, 1856, refusing to pay for the goods because they had not been received, constitute such memorandum. The letter written by the defendant, in the case of *Richards* v. *Porter*, above cited, was held not to be such memorandum in writing. That letter was written, after the receipt of the invoice, and admitted that the defendant, in that case, had bought the goods, alleged to have been sold, and only complained that they had been delayed too long, stating that, unless they should arrive soon, the defendant would have to purchase others ; and the only reason upon which it was held that the statute was not satisfied, was that there had been no delivery to, and acceptance of, the goods by the defendant, and no writing, or part payment, or earnest given, to charge him. In *Johnson* and *Patton's* letter, there is no recognition of any purchase, by them, of the goods, but only that the goods had been shipped to them by the house of the appellees, and had not been received, and, for this reason, they say, they decline to accept the draft drawn for them. The letter concludes with a casual civility, that seems to be seized upon by the counsel for the appellees, as a suffi-

cient memorandum in writing to take the case out of the statute of frauds. It is as follows: "If you can ascertain what disposition the boat has made of her cargo, we shall be pleased to hear from you." Now, it is said that this clause of the letter, in connection with the bill of lading and invoice, received from the appellees, form a "complete written contract," and 2 Pars. on Cont. 285, and note c, are referred to as authority. Upon examination of the text cited, it will be seen that the writer holds this language: "If the agreement be not itself signed, but a letter, alluding to, and acknowledging the agreement, is signed, this is sufficient." The note in support of this doctrine, which we do not dispute, contains a reference to a number of cases, all of which militate against the conclusion arrived at by the counsel for the appellees. The particular authority in this note, relied upon by the appellees, we presume, is *Jackson* v. *Lowe*, 1 Bing. 9. There, the purchaser of a hundred sacks of good *English* seconds flour, at 45 shillings a sack, wrote to the vendors as follows: "I hereby give you notice, that the flour you delivered to me, in part performance of my contract with you for one hundred sacks of good *English* seconds flour, at 45 shillings per sack, is of so bad a quality that I cannot sell it, or make it into saleable bread. The sacks of flour are at my shop, and you will send for them, otherwise I shall commence an action." To this the vendors, by their attorneys, answered: "Messrs. *L.* and *L.* consider they have performed their contract with you as far as it has gone, and are ready to complete the remainder; and, unless the flour is paid for at the expiration of one month, proceedings will be taken for the amount." It was held that the jury were warranted in concluding that the contract mentioned in the vendor's answer, was the same as that particularized in the letter of the vendee. In the same note (c), we find the case of *Richards* v. *Porter*, 6 Barn. and Cress. 437, the correspondence in which, we have already quoted in this brief; and it is, according to our view, a very apt authority, and a complete answer to the entire argument of the counsel for the appellees on this question. The case of *Jackson* v. *Lowe* bears no resemblance, in its facts, to the case at bar. We refer the Court, on this question, to Brown on the Statute of Frauds, §§ 328 to 333, inclusive, and the authorities there cited and commented on.

In view of the facts in this case, the first instruction given by the Court, at the instance of the appellees, is wrong. A delivery of goods by the seller to a common carrier, is not a sufficient delivery to the vendee, to charge him for goods sold and delivered, in the absence of a contract such as would satisfy the statute of frauds. This is now admitted by the counsel for the appellees; and we insist that this admission is equivalent to a confession of error in this particular.

The third and fourth instructions given, at the instance of the appellees, are also erroneous, as being irrelevant, and not warranted by any facts disclosed in the evidence. They are liable to the further objection, of taking from the jury the decision of a question which should have been left to them to decide.

(2) Counsel for the appellees argued as follows:

The appellants contended in the Court below, and will, we presume, insist here, as it seems to be the only point in the case, that the contract, being for the sale of goods of over 50 dollars in value, is void by the statute of frauds. 1 R. S. p. 301, § 7.

This objection to the validity of the contract is susceptible of two answers:

1. At common law, the contract would have been binding, and the question of its invalidity must depend upon the law of *Pennsylvania*, as it was made and to be performed there, so far as any act of the appellees was concerned. There was no proof as to whether the statute of 29 Car. II. is in force in *Pennsylvania* or not; and the question is, what will the Courts of *Indiana* presume on the subject? We insist that it must be presumed, the contrary not appearing, that the common law is in force in that state upon this subject. There is an apparent conflict in the decisions upon the question as to how far the Courts will indulge the presumption of the common law being in force in other states; but without endeavoring to reconcile them, or yet to argue which class is the better authority, we remark that within the spirit of them all our position is correct.

It has been frequently decided that the question of the statute of frauds is one of evidence, not of pleading. *Miller* v. *Upton*, 6 Ind. R. 53. When the evidence was introduced, it appeared that the contract was made, and, so far as any act of the appellees was concerned, was to be performed in *Pennsylvania*. At this point, the appellants object that the contract, good at common law, is void by the statute of frauds. What statute? No statute of *Pennsylvania* is proved, and none of *Indiana* can operate there, because beyond the jurisdiction of the state.

It then devolves upon the party setting up the defense of invalidity, to make it good. *Stout* v. *Wood*, 1 Blackf. 71, illustrates our position. That was an action of slander, for words spoken in *Ohio*, which would have been actionable in *Indiana* by virtue of our statute, but which were not actionable at common law, or shown to be actionable under any statute of *Ohio*. A judgment for the plaintiff was reversed on the sole ground that the Courts could not presume a statute to be in force in another state which would confer a right of action for what was not actionable at common law, although such statute would be identical with our own. Now, can the Courts presume that a statute exists in *Pennsylvania*, which gives a party a defense which he would not have at common law, although he has it by the statute of this state? The doctrine of this case was affirmed in *Titus* v. *Scantling*, 4 Blackf. 89, and *Offutt* v. *Earlywine*, *id.* 460. The case of *Trimble* v. *Trimble*, 2 Ind. R. 76, is directly in point. That was a bill for divorce and alimony; and an answer was put in denying the marriage, which was alleged to have taken place in *Virginia*. The Court say: "As no statute of *Virginia* upon the subject was in evidence on the trial of this cause, the common law would be presumed to be in force there relative to marriage contracts; and hence, the marriage in this case, which may be inferred from the evidence, might have been valid." No distinction can possibly exist between *Trimble* v. *Trimble*, and the case at bar, so far as the question under discussion is concerned. To paraphrase the above language, it would read thus: "As no statute of *Pennsylvania* upon the subject was in evidence on the trial of this cause, the common law would be presumed to be in force there relative to contracts of sale; and hence, the sale in this case, which may be inferred from the evidence, is valid."

It is true, that the cases in 8 and 9 Ind. R., collected in § 2, p. 477, Perk. Dig., tit. Foreign Law, following the remarks of Foot, J., in *Monroe* v. *Douglass*, 1 Seld. 452, hold that the *lex fori* furnishes, in all cases, *prima facie*, the rule of decision; and if a party wishes the benefit of the *lex loci contractus*, he must aver and prove it; still, we do not believe it to have been the intention

of the Court to overrule the earlier cases which establish the doctrine in *Trimble* v. *Trimble*.

There was some apparent conflict in the authorities, but the better and more modern opinion seems to be that the *lex loci contractus* governs in the case of goods ordered in one state to be sent to, and paid for, in another. Story's Confl. of Laws, § 285.—16 U. S. Dig. 428, § 19, citing *Houghtaling* v. *Ball*, 19 Mo. R. (4 Benn.) 84. Such being the case, it seems to follow, as a necessary consequence, that the party claiming a defense under the law of the contract, should aver and prove it.

2. But, admitting that the contract was at first void by the statute of frauds, still we insist that there has been such a delivery of the goods as to take the case out of the statute, and make the contract valid.

After a careful examination of the authorities, we are led to the belief that the doctrine of *Hart* v. *Sattley*, 3 Camp. 528, and *Dawes* v. *Peck*, 8 T. R. 330, where it is held that the delivery of goods to a common carrier, without any further act of the vendee, is a delivery to the vendee, has been overruled in the cases cited in Browne on the Statute of Frauds, §§ 328, 329, and 330, and in 2 Pars. on Cont. 327, 330. The current of authority now seems to be that the contract is not completed by the delivery of the goods to a common carrier, unless they have been received, or the act of the vendor in shipping has been recognized and ratified by the vendee.

We insist, however, that in this case, the conduct of the appellants has ratified the contract, and taken the case out of the statute.

A fair construction of the appellant's orders as to shipping is, that the appellees should ship by steamboat at the first opportunity. It is true, the witness, *Ward*, states that the appellees were told to ship by the first boat; but these were mere general instructions, and ought not to be so construed as to lead to unreasonable and absurd results. Suppose the first steamboat for the *Wabash* river had been notoriously unseaworthy, whereby the safety of the goods would have been greatly jeopardized; or, suppose the captain had demanded ten times the customary rates of freight for the transportation of the glass, would it be insisted that the appellees could have justified the shipment of the glass under such circumstances, when, perhaps, their waiting a single hour would have afforded an opportunity to ship on a standard boat at ordinary prices? The evidence shows due diligence on the part of the vendors to, ship the goods, and a reasonable compliance with the vendee's orders. The bill of lading was sent to, and received by, the defendants, and for several months they failed to notify the plaintiffs of their dissent to the shipment on board the *Powell*, although they saw the *Latrobe* at the wharf in *Lafayette*, early in *April*. They were apprised of the fact of the glass being at *Terre Haute*, where it was discharged by the *Powell*, as early as *May* or *June*, and still they do not dissent. Finally, on the 16th of *September*, they make inquiries, and express a desire to find the property; and although they refuse to accept the draft because the glass has not arrived, still they do not intimate that they are not liable for the debt. It was urged that these acts amounted to nothing, but the question was one of fact properly left to the jury, and they have found by their verdict that the appellants have ratified the act of shipment. It seems that this should settle the case. *Bushel* v. *Wheeler*, 15 Q. B. 442, n, cited in note u, 2 Pars. on Cont. 329, is directly in point.